**Opinion issued May 6, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00557-CR

————————————

**GEOFFREY FERGUSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 93878-CR**

---

## MEMORANDUM OPINION

A jury found appellant, Geoffrey Ferguson, guilty of the felony offense of

murder[1] and assessed his punishment at confinement for sixty years. In two issues,

---

[1]     *See* TEX. PENAL CODE ANN. § 19.02(b), (c).

appellant contends that the trial court erred in denying his motion to suppress and admitting certain evidence.

We affirm.

## Background

Charles Cofer testified that he was appellant's friend, and when they hung out, they drank beer and whiskey together. Cofer saw appellant about every other weekend, and if appellant "got too intoxicated" while hanging out, appellant would spend the night at Cofer's home.

According to Cofer, on the night of September 4, 2021, he went to bed at approximately 10:00 p.m. or 11:00 p.m. Around 4:00 a.m. on September 5, 2021, Cofer received an alert through Facebook Messenger[2] from appellant, which showed that appellant was calling Cofer. The alert woke Cofer up, and he was worried something bad had happened because he usually did not receive telephone calls.

When Cofer spoke to appellant, appellant was "emotionally distraught." He told Cofer that "he killed his father," William "Bill" Ferguson, the complainant,

---

[2] *See Edwards v. State*, 497 S.W.3d 147, 155 n.8 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("Facebook Messenger is a mobile tool that allows users to instantly send chat messages to friends on Facebook. Messages are received on [users'] mobile phones." (alteration in original) (internal quotations omitted)); *see also Hassan v. Facebook, Inc.*, No. 19-cv-01003-JST, 2019 WL 3302721, at *1 (N.D. Cal. July 23, 2019) (order) (noting plaintiff used Facebook Messenger application to communicate with others via calls and instant messages).

with whom he lived. Cofer "begged and pleaded with him to call the cops," but appellant was "just emotionally distraught" and "kind of rambling." After the telephone call "shut off," Cofer decided to call for emergency assistance because he thought that appellant had killed himself.

An audio recording of Cofer's telephone call to emergency assistance was admitted into evidence during his testimony. During the call, Cofer stated that appellant called him around 4:40 a.m. and told him that he had killed the complainant. Appellant told Cofer that he had shot the complainant "once in the head" and then "seven more times." Appellant was crying and stated that he had "thought about it" and he "did it." Cofer pleaded with appellant to call law enforcement and to not kill himself. Cofer's telephone call with appellant then abruptly ended, and Cofer told the emergency assistance operator that he believed appellant had "killed himself."

Later in the morning on September 5, 2021, law enforcement officers called Cofer to tell them that they had found appellant and "he had taken a bunch of pills," but he was alive.

While testifying at trial about his telephone call to emergency assistance, Cofer confirmed that on September 5, 2021, he believed that appellant "may have taken his own life" "[b]ecause [of] previous incidents where he had" tried to kill himself. According to Cofer appellant had previously attempted suicide at least

3

twice around 2015 and 2016. One of those times, appellant "had taken a bunch of pills." Cofer thought that appellant had been hospitalized twice because of his suicide attempts. Cofer also characterized appellant's alcohol use as abusive and stated that his alcoholism affected his ability to "hold down jobs." Appellant had gone to jail several times before for his alcoholism. Appellant owned two or three firearms.

During a telephone call with appellant after his arrest, appellant told Cofer that "he had been honest about everything with law enforcement from the get-go." On the same call, appellant told Cofer that he was seeing a doctor while incarcerated and "the doctor said he was not insane."

Jeremy Fike testified that appellant was his first cousin, and they were close growing up. The complainant was Fike's uncle. As to appellant's alcohol use, Fike stated that appellant abused alcohol and his use was "[r]ampant" and "[e]xcessive."[3] Appellant "started having a drinking problem" around sixteen years old. The complainant did not like appellant's drinking, and he did not "want his son being drunk in the house all the time," but he did not do anything about appellant's drinking either.

---

[3] The complainant's brother and appellant's uncle, Rick Ferguson ("Rick"), similarly testified that appellant's drinking was "[e]xcessive." Beer cans littered the portions of the home where appellant stayed.

4

Fike further testified that before the complainant's death, appellant had made four or five suicide attempts, and some of those suicide attempts "involve[d] consuming pills." According to Fike, appellant, in the past, had used more than one of his purported suicide attempts "to get out of trouble." One of appellant's suicide attempts occurred when he "had a pending misdemeanor court case," and the suicide attempt resulted in appellant being hospitalized for a few days.[4]

On September 5, 2021, Fike received a message from appellant through Facebook Messenger at 4:15 a.m. Appellant's message read:

> Probably won't hear from me again. I'm going to end his pain and then call the police. You have no idea what thiis [sic] is like bro. I just wanted to tell you first. I understand that you will never talk to me again, but I love you Jeremy. And thank you for always making excuses for me.[5]

Fike responded to appellant's message after he woke up, about 9:29 a.m., asking appellant to call him.

During Fike's testimony, the trial court admitted into evidence a journal, which Fike testified contained lyrics and poetry written by appellant. According to Fike, appellant would sometimes share his writings with him via text message, and their general themes were "usually pretty sad," "a lot of self-loathing, hurt feelings

---

[4] Rick also testified that appellant had previously attempted suicide before the complainant was killed.

[5] The trial court admitted into evidence a copy of the message appellant sent to Fike on September 5, 2021 at 4:15 a.m.

type things." Fike read out loud some of appellant's lyrics from the journal, which included:

> Cause you should know that if you push me just a bit, I'm gonna hit you where you spit. Push me too hard, well then it's turning large. Which means you . . . and I'm the sarge taker. I will .45 you in the face making our moms have to pace hoping that you see the . . . gates. . . . Hoping that you filled bad traits. Didn't live life cause we all know that if you carrie a gat,[6] you better be quick to pull that Jack, or your brain gets splat. . . . How strong the mind is, and to think we all came from jizz. . . . MF – you get paid for being fat. That's the role and you want me to have kids? . . . That'd be great. You could show another generation model that I had.[7]

(Internal quotations omitted.)

Fike further testified that he believed that appellant loved the complainant, but there was a lot of resentment and a lot of rage on appellant's part. Fike never saw the complainant be violent toward appellant.

Pearland Police Department ("PPD") Officer M. Webb testified that in September 2021, he was a patrol officer working the night shift. On September 5, 2021, about 4:55 a.m., Webb was dispatched to appellant's home in Brazoria County, Texas in response to a "discharge of a firearm slash welfare concern call." (Internal quotations omitted.) According to Webb, Cofer had called for emergency assistance after appellant had called him and told him that "he had shot [the

---

[6] Fike testified that "gat" referred to a firearm. (Internal quotations omitted.)

[7] According to Fike, the complainant had wanted appellant to have children.

complainant] approximately seven times." Webb arrived at appellant's home at 4:57 a.m.

During Officer Webb's testimony, a copy of a videotaped recording from his body-worn camera on September 5, 2021 was admitted into evidence. In the videotaped recording, appellant can be seen sitting on a bench at a house. At certain points during the recording, appellant can also be seen standing while Officer Webb searches him. Webb reads appellant his *Miranda* rights[8] after which appellant states that he understands his rights and is willing to talk to Webb.

When appellant speaks to Officer Webb, he states that the complainant reacted to the first gunshot and "looked at" him, so appellant "finish[ed]." Appellant then tells Webb that he "didn't want to not kill" the complainant. Appellant also states, "It's bad . . . fucking horrible." Further, appellant tells Webb that the complainant had been sick with cancer for about one year, and appellant was assisting the complainant's death.

After speaking with Officer Webb, appellant is walked to a patrol car by two law enforcement officers. When Webb asks appellant, as he is walking to the patrol car, how much appellant had to drink that day, appellant responds that he does not know. Appellant is placed in the backseat of the patrol car, where he subsequently falls asleep. When it is time to transport appellant away from the

---

[8]     *See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22.

scene, Webb and another law enforcement officer wake up appellant and assist him in sitting correctly in the car and with buckling his seatbelt.

While watching the videotaped recording from his body-worn camera during his testimony, Officer Webb stated that appellant, on the recording, told law enforcement officers that a firearm was in his bedroom,[9] and a firearm can be seen in the videotaped recording on an "end table or dresser against [a] bed." The firearm appeared to be unloaded. According to Webb, appellant can be heard on the videotaped recording saying, "I did not want to kill him." (Internal quotations omitted.) Further, appellant said that "he wanted to end it," which Webb took to mean that appellant shot the complainant "several more times," "[a]s if he had the intent to murder" the complainant.

Officer Webb further testified that he spoke to appellant while at appellant's home and asked him how much alcohol he had to drink because Webb could smell alcohol on appellant's breath and person. Appellant appeared "highly intoxicated" and intoxicated "[t]o a degree."[10] Appellant was lethargic and had "slow speech." He was slurring his words and stumbled. But he was able to stand and was coherent; he spoke in complete sentences. Appellant was "able to give [Webb] a

---

[9] Officer Webb stated that there were other firearms in the home, too. Rick testified that there were more than five firearms in appellant's home.

[10] Officer Webb noted that there were "lots of beer cans in the house."

version of events multiple times" after Webb read appellant his *Miranda* rights.[11] Appellant told Webb where the firearm was in the home and how "everything transpired." While speaking to Webb, appellant gave information about the complainant's medical condition, and appellant was clear that he did not want the complainant to survive. According to Webb, appellant's statement to him was voluntarily made; appellant understood what he was doing and was very helpful. "He kept trying to point [law enforcement officers] in the right direction, wanted to show [them] where the gun was. He was all there in his right mind." Later, after appellant was placed in a patrol car, he became tired and fell asleep.

Officer Webb also noted that while he was on his way to appellant's house, he received an alert of "suicide by cop," which meant that appellant had made references in the past "that he wanted to die by suicide by cop, to get [law enforcement officers] to shoot him." Appellant spoke to Webb about "suicide by cop" that night, but he did not appear to have an intent to kill himself. In his offense report, Webb made a note about appellant's suicide attempts.

PPD Lieutenant H. Hunt testified that on September 5, 2021, he was dispatched about 4:54 a.m. after an emergency assistance call about someone shooting his father. Hunt arrived at a home with other law enforcement officers

---

[11]    Officer Webb asked if appellant understood his rights, and appellant indicated he did.

and found appellant pacing back and forth inside a room in the home. Hunt heard a song playing in the home that said, "I miss you when you're gone."

Lieutenant Hunt further testified that when law enforcement officers first made contact with appellant inside the home, he smelled like he had been drinking alcohol. Appellant answered law enforcement officers' questions and was not lethargic. He was helpful and forthcoming. As time progressed at the scene though, appellant became more intoxicated; but when Officer Webb read appellant his *Miranda* rights, his demeanor was not that of a highly intoxicated person.

Lieutenant Hunt also noted that in the past, law enforcement officers had responded to appellant's home related to "suicidal calls." Hunt saw pill bottles in appellant's home on September 5, 2021.

Dr. Erin Barnhart, the chief medical examiner for Galveston County, Texas, testified that she performed autopsies for Brazoria County. She performed the complainant's autopsy; the complainant had been shot six times in his head and chest. The complainant had one gunshot wound in his left eyeball socket, one gunshot wound on his right cheek, three gunshot wounds close to each other on the complainant's right chin and lower cheek area, and one gunshot wound on the right side of his chest. Individually, each gunshot wound would have been potentially fatal. As to the gunshot wound to the complainant's chest, Barnhart stated that it would have been fatal within minutes because of blood loss. The chest gunshot

10

wound would not have rendered the complainant unconscious immediately. The gunshot wounds to the head would have resulted in the complainant's immediate unconsciousness and a "[v]ery fast" death. According to Barnhart, the cause of the complainant's death was "multiple gunshot wounds," and the manner of death was homicide.

PPD Detective C. Arnold testified that when law enforcement officers arrived at appellant's home on September 5, 2021, appellant was sitting in a chair, and he freely came to answer the door. Appellant was fully cooperative with the law enforcement officers and spoke with them. Thus, it was possible that at that time appellant was in "his right frame of mind" and aware of what he was doing. Appellant could have been "[c]ognizant of his actions and the possible repercussions."

Later, on September 6, 2021, Detective Arnold spoke with appellant at the jail after reading him his *Miranda* rights. At that time, appellant admitted that he was inebriated, and appellant mentioned that he had drunk beer. Appellant also stated that he was suffering from anxiety and depression. When speaking to Arnold, appellant did not try to minimize what had happened, and he stated that he knew he "ha[d] to pay a penalty." He said he did not want the complainant to suffer. Appellant indicated to Arnold that, after his arrest, he had tried to hang

11

himself in his jail cell with his pant leg, and he admitted to having been in "rehab for committing suicide, had slit his wrists."

Detective Arnold further explained that he had seen photographs of the gunshot wounds to the complainant's chin area, which he described as a "[v]ery tight grouping or patterning of . . . shots." To Arnold, the wounds indicated that appellant was an experienced shooter with accuracy, and it was not something he would see if appellant had been intoxicated at the time of the shooting. Arnold described appellant's actions as a "deliberate shooting." Appellant would have needed a "slow aim" and "trigger control." Arnold also noted that the complainant was in his bed when appellant "took deliberate-aimed fire toward" the complainant.

Appellant testified that he began drinking alcohol in high school, but when he was about twenty-four or twenty-five years old it became "habitual." Thus, for about twenty years, drinking alcohol had "been an issue" for him. Appellant also noted that he occasionally abused pills, such as Xanax and Zoloft, and appellant acknowledged that he had been to the hospital a couple of times for prior suicide attempts. Once in 2015 and another time, he "swallowed a number of pills." Appellant noted that there was "a lot of negativity in [his] house" over the years, and while his mother was alive, they did not get along. He also "didn't get along with [the complainant] . . . that great" either.

According to appellant, about a year before the shooting, he sent his friend, Zachary Freeman, messages about his anger and resentment toward the complainant.[12]  Appellant acknowledged that some of the messages sounded like he was enraged, and although he had mentioned wanting to kill the complainant in his messages, that was "mainly just venting out of jest."  Appellant explained that he felt resentment toward the complainant because after the complainant became sick with cancer,[13] he had "to do a lot more stuff" for the complainant, such as bathe him, help him in the restroom, and give him enemas.  The complainant, who was a large man, then became comfortable walking around the home naked and leaving the bathroom door open.  Appellant did not have any outside help for the complainant, and he was responsible for driving the complainant to and from doctors' appointments.  As the complainant became sicker, appellant and the complainant would argue more.

As to shooting the complainant, appellant testified that he did not have a plan, and he did not go buy a firearm in preparation to kill the complainant. Appellant first bought a "9 millimeter" handgun after a co-worker let him shoot one and then he "just kind of got gun crazy."  On September 4, 2021, appellant started drinking alcohol about an hour or two after waking up.  He believed that he

---

[12]     The trial court admitted into evidence copies of appellant's messages to Freeman during the State's case-in-chief.

[13]     Appellant believed that the complainant was diagnosed with cancer in 2020.

13

drank "[a]t least 30 beers" that day. During the day, appellant helped the complainant bathe, and the complainant walked around the home naked. Appellant put the complainant to bed about 11:00 p.m. The complainant made appellant "lift his legs in [the bed] one at a time," and because the complainant slept naked, "his private parts were in [appellant's] face." When appellant made a comment about it, the complainant told him "to quit [his] bitching."

After the complainant went to bed, appellant got online to play "PC games" with his friend Freeman, and appellant continued drinking alcohol. Appellant played games for several hours and was drunk. He stated that he did not remember anything "very well." He had no plan to kill the complainant or commit suicide, but he was feeling resentment, anger, and rage. He only vaguely remembered shooting the complainant. He was not careful or deliberate when shooting.

Appellant further testified that when law enforcement officers arrived at his home, he did not have a weapon on him, and he did not try to run. Appellant was intoxicated because he had drunk alcohol and "had taken a bunch of [his] pills," about seventy or eighty. Appellant did not remember much after being handcuffed by law enforcement officers. Appellant did recall speaking with Detective Arnold and stated that everything that he told Arnold was the truth. Appellant told Arnold that he was intoxicated when the shooting occurred.

14

According to appellant, he did not want to kill the complainant for money. He also stated that he never wanted "[s]uicide by cop" to occur. But appellant had tried to hang himself while in his jail cell because he "felt horrible for what [he] did" and he "wanted to be there with [the complainant] and [his] mother and just end it."

On cross-examination, the State asked appellant if he had "fantasized about killing [his] mother," and appellant responded, "Not to my knowledge, no." Appellant was then asked, "[Y]ou never shared a fantasy about stabbing your mother and your mother's blood being sprayed all over you with . . . Fike?" To which appellant responded, "I don't remember making a statement like that, no, sir," but "[b]lackout drunk I may have said something." Appellant also stated, "I've never made a statement like that before," but "I'm not saying that I didn't."

Additionally, appellant acknowledged that the journal that Fike testified about belonged to him and he had written the lyrics inside, some of which referred to the complainant. Appellant was not in a "normal mindset" when he wrote the lyrics and was "[k]ind of at the end of [his] rope." He thought about killing the complainant in the year before the complainant's death.

Appellant further testified that although he had drunk about thirty beers before killing the complainant, he was not "blackout drunk." He could still use his computer and play video games. Appellant was also able to use punctuation in his

15

message to Fike despite his drinking, and he remembered messaging Fike about 4:15 a.m. on September 5, 2021. According to appellant, he told Fike, "I'm going to end his pain and then call the police," before he shot the complainant. He also "[p]robably" put his and the complainant's dogs outside the house before shooting the complainant—meaning he went in the complainant's bedroom to get the complainant's dog and took her to the backyard before going back inside and shooting the complainant. Appellant turned on the light in the complainant's bedroom before shooting him. Appellant told the complainant "I love you," and he thought the complainant said something back. (Internal quotations omitted.)

After the first shot, appellant recalled that the complainant looked at him with "his eyebrows kind of furrowed." He did not know how many times he shot the complainant, but he knew that his firearm was "empty." He shot the complainant while standing at the foot of the bed, and he put a blanket over the complainant after he died. Basically, appellant shot the complainant, covered him up, and left the room.

Appellant agreed that a firearm was a deadly weapon, he intentionally shot the complainant, shooting the complainant was an act clearly dangerous to human life, and he caused the complainant's death. Appellant believed that the complainant was "in a better place."

16

## Motion to Suppress

In his first issue, appellant argues that the trial court erred in denying his motion to suppress his oral statement to Officer Webb because it was involuntarily made due to "severe intoxication."

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* The trial court, at a suppression hearing, is the sole and exclusive trier of fact and judge of the witness's credibility and may choose to believe or disbelieve all or any part of the witness's testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). If, as in this case, the trial court makes express findings of fact, we review the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports the fact findings. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). A trial court's findings on a motion to suppress may be written or oral.[14] *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App.

---

[14] In a portion of his first issue, appellant complains that the trial court did not "enter an order stating its conclusion as to whether or not [his] statement was voluntarily made, along with the specific findings of fact upon which the conclusion was based" as required by Texas Code of Criminal Procedure article 38.22, section 6. (Internal quotations omitted.) Thus, appellant requests that we direct the trial

2006); *State v. Groves*, 837 S.W.2d 103, 105 n.5 (Tex. Crim. App. 1992). We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Valtierra*, 310 S.W.3d at 447.

We review the trial court's legal ruling de novo unless its explicit findings that are supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra*, 310 S.W.3d at 447–48.

Under both constitutional law and state law, a defendant's statement or confession must be voluntary to be admissible. *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020); *see* TEX. CODE CRIM. PROC. ANN. art. 38.21 ("A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion . . . ."). A

court to "prepare and file findings of fact and conclusions of law regarding the voluntariness of appellant's statement[]." Under Texas Code of Criminal Procedure article 38.22, trial courts are required to make written findings when a question is raised regarding the voluntariness of a defendant's statement. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. However, "[a] trial court satisfies the requirements of [a]rticle 38.22 when it dictates its findings and conclusions to the court reporter," and the findings and conclusions are transcribed, filed with the trial court, and included in the appellate record. *Murphy v. State*, 112 S.W.3d 592, 601–02 (Tex. Crim. App. 2003). Here, that has been done, and we decline to direct the trial court to prepare and file written findings of fact and conclusions of law. Thus, we overrule this portion of appellant's first issue.

18

defendant may claim that his statement was involuntary and therefore may not be used as evidence against him under different theories: (1) general voluntariness, Texas Code of Criminal Procedure article 38.22, section 6; (2) *Miranda v. Arizona*, 384 U.S. 436 (1966), as expanded in the Texas confession statute, Texas Code of Criminal Procedure article 38.22, sections 2 and 3; and (3) the Due Process Clause of the United States Constitution. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Involuntariness is reviewed under each of these theories by examining the totality of the circumstances surrounding the statement or confession. *Lopez*, 610 S.W.3d at 494.

A statement is involuntary for purposes of federal due process only when there is police overreaching, i.e., some coercive police activity causally related to the confession. *Oursbourn*, 259 S.W.3d at 169–70; *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); *cf. Miranda*, 384 U.S. at 478. This is because the Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting people from themselves or other private actors. *Oursbourn*, 259 S.W.3d at 170; *see, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 161–64, 169–71 (1986) (holding if there is no police coercion or overreaching, there is no due-process violation—even if suspect is suffering from chronic schizophrenia and is in psychotic state following "voice of God" at time he confesses (internal quotations omitted)).

Conversely, under Texas Code of Criminal Procedure article 38.22, section 6—the "general voluntariness" provision—a defendant may claim that his statement was not freely and voluntarily made and thus may not be used as inculpatory evidence. *See Oursbourn*, 259 S.W.3d at 169–70; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. The general voluntariness provision may be construed as "protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement," and police overreaching is not required to claim involuntariness. *Oursbourn*, 259 S.W.3d at 172.

At a hearing outside the presence of the jury, appellant moved to suppress the videotaped recording from Officer Webb's body-worn camera which contained his oral statement to Webb. Appellant asserted that he was "highly intoxicated" at the time he waived his *Miranda* rights and agreed to speak with Webb.

Officer Webb testified at the suppression hearing that when he encountered appellant at appellant's home, he smelled a strong odor of alcohol coming from his breath and person. However, while intoxication is a relevant factor, it does not render a defendant's confession involuntary per se. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996). Rather, the inquiry is "whether the defendant's intoxication rendered him incapable of making an independent, informed decision to confess." *Id.*; *Saldana v. State*, 59 S.W.3d 703, 712 (Tex. App.—Austin 2001, pet. ref'd) ("Even if we assume that [defendant] was intoxicated when he was

20

arrested and interrogated, that fact alone is not sufficient to render his confession involuntary.").

During the suppression hearing, the trial court viewed the videotaped recording from Officer Webb's body-worn camera, which showed the entirety of Webb's interaction with appellant. *See, e.g.*, *Harris v. State*, No. 12-24-00072-CR, 2024 WL 4001830, at *3 (Tex. App.—Tyler Aug. 29, 2024, no pet.) (mem. op., not designated for publication) ("The trial court viewed the video and from it was able to assess [the defendant's] state of mind."). Further, Webb testified that after he informed appellant of his *Miranda* rights, appellant knowingly and intelligently waived them, and appellant wanted to speak with Webb. Appellant indicated that he understood what Webb told him and what Webb was saying to him. According to Webb, he read appellant his *Miranda* rights even though he knew that appellant could "be intoxicated," but Webb did not have to repeat the *Miranda* warnings to appellant multiple times.

Officer Webb additionally testified that appellant appeared to be "[s]lightly" lethargic, and Webb noted that there was a "strong odor of [an] unknown alcoholic beverage" emitting from appellant's breath and person. Further, appellant had an "unbalanced stance" and was slightly slurring his words at times. Although Webb felt that appellant "had alcohol in his system," appellant appeared to Webb to voluntarily waive his rights based on the answers that appellant gave. Appellant

21

knew "what he was doing," and he was not "inebriated to the point that [he was not] coherent." "Nothing was forced out of [appellant]," and the videotape recording from Webb's body-worn camera showed that appellant spoke in "clear sentences," "knew what was going on around him," and was capable of being understood by law enforcement officers. Webb understood everything appellant said to him; he was coherent, and his thought processes and speech were logical.

After viewing the videotaped recording and hearing the conversation between Officer Webb and appellant, the trial court found that appellant intelligently and knowingly waived his rights and his statement to Webb was voluntary despite appellant's assertion that he was too intoxicated. We conclude that nothing in the record suggests that the trial court abused its discretion in finding that, despite appellant's intoxication claim, appellant was capable of voluntarily and knowingly waiving his rights and was able to coherently respond to Webb's questions throughout the interview. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress.

We overrule appellant's first issue.

## Admission of Evidence

In his second issue, appellant argues that the trial court erred in admitting certain testimony during the guilt phase of trial because he was not given sufficient notice.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Initially, appellant appears to assert that the trial court erred by admitting into evidence a "[l]ong discussion" about extraneous offense evidence that relates to Fike's testimony during the guilt phase of trial. Appellant then spends the next approximately eight pages of his brief exclusively block quoting testimony from Fike, statements and questions by the attorneys, and statements and rulings from the trial court, in nonsensical manner, with little to no differentiation between discussions and testimony that happened outside the presence of the jury versus in the presence of the jury.

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008); *Chaves v. State*, 630 S.W.3d 541, 555, 557–58 (Tex. App.—Houston [1st Dist.] 2021, no pet.). As the Texas Court of Criminal Appeals has emphasized, an appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe v. State*, 509 S.W.3d 325, 342–43 (Tex. Crim. App. 2017); *Busby*, 253 S.W.3d at 673; *see also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make appellant's arguments for him . . . ."). Thus, to the extent that appellant complains in his second issue about the trial court's admission of a "[l]ong discussion" that relates to Fike's testimony during the guilt phase of trial, we hold that it is waived due to inadequate briefing.

Appellant next argues that the trial court erred in admitting his testimony on cross-examination about whether he had "fantasized about stabbing" his mother

because it constituted extraneous offense evidence and the State did not provide notice under Texas Rule of Evidence 404(b)(2).

An extraneous offense is "any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (internal quotations omitted). Texas Rule of Evidence 404(b) prohibits the admission of extraneous offense evidence during the guilt phase of trial to prove that a defendant committed the charged offense in conformity with a bad character. TEX. R. EVID. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Such evidence may be admissible, however, when it has "relevance apart from character conformity," such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2); *see also Devoe*, 354 S.W.3d at 469. However, Texas Rule of Evidence 404(b)(2) provides that "[o]n timely request by a defendant in a criminal case, the [State] must provide reasonable notice before trial that the [State] intends to introduce" extraneous offense evidence, "other than that arising in the same transaction," in its case-in-chief. TEX. R. EVID. 404(b)(2).

25

On cross-examination, the State asked appellant if he had "fantasized about killing [his] mother," and appellant responded, "Not to my knowledge, no." Appellant was then asked, "[Y]ou never shared a fantasy about stabbing your mother and your mother's blood being sprayed all over you with . . . Fike?" to which appellant responded, "I don't remember making a statement like that, no, sir," but "[b]lackout drunk I may have said something." Appellant also stated, "I've never made a statement like that before," but "I'm not saying that I didn't."

This testimony by appellant does not constitute extraneous offense evidence. "To constitute an extraneous offense, the evidence must show a crime or bad act, and that the defendant was connected to it." *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992). Notably, the evidence must include "some sort of extraneous *conduct*" by the defendant. *Castillo v. State*, 59 S.W.3d 357, 361 (Tex. App.—Dallas 2001, pet. ref'd); *see also Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993). Statements about a defendant's thoughts of wrongdoing "are merely inchoate thoughts" and are not considered extraneous offense evidence. *Castillo*, 59 S.W.3d at 361–62 (holding "inchoate thoughts" concerning defendant's desire to kidnap and kill were not extraneous offense evidence in absence of conduct that "could constitute a bad act or wrong, much less a crime"); *see also Greene v. State*, 287 S.W.3d 277, 285 (Tex. App.—Eastland 2009, pet. ref'd) (concluding defendant's "statements about his feelings for [the complainant]

26

and what he wanted to do to her pertained to his thoughts and did not implicate any conduct on his part that would invoke [Texas] Rule [of Evidence] 404(b)").

When evidence does not constitute extraneous offense evidence, Texas Rule of Evidence 404(b) is not implicated, and the State need not comply with the notice requirement in rule 404(b)(2). *Castillo*, 59 S.W.3d at 361–62. Thus, we hold that the trial court did not err in admitting appellant's cross-examination testimony relating to thoughts of stabbing his mother.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).